**In re JACKSON LOCKDOWN/MCO CASES.**

Civ. No. 81–72151.

United States District Court,
E.D. Michigan, S.D.

June 28, 1983.

On Motion for Summary Judgment
July 13, 1983.

Martin Geer of Kessler & Geer, Ann Arbor, Mich., Neal Bush of Bush, Bennett & Magid, Detroit, Mich., for plaintiffs.

Brian MacKenzie, Asst. Atty. Gen., for the State of Michigan, Lansing, Mich., for defendants.

Eileen Nowikowski, of Marston, Sachs, Nunn, Kates, Kadushin & O'Hare, P.C., Detroit, Mich., for defendant Mich. Corrections Organization, and various prison guards sued individually and in their official capacity.

Jane Garrett, of Schureman, Frakes, Glass & Wulfmeier, Detroit, Mich., for defendants Jeffrey Schoendorf and William Schnarrs, prison guards sued individually and in their official capacity.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | The Procedural Background | 872 |
| | A. Consolidation of Cases | 872 |
| | B. The Motions to Dismiss | 872 |
| II. | The Facts as Alleged | 873 |
| III. | The 42 U.S.C. § 1983 Claim | 875 |
| | A. MCO Motion: State Action | 875 |
| | B. State Motion | 877 |
| | 1. Personal Involvement | 878 |
| | 2. Constitutionality of Post-Riot Conditions | 878 |
| IV. | The 42 U.S.C. § 1985(3) Claim | 878 |
| | A. Elements of a § 1985(3) Claim | 878 |

## TABLE OF CONTENTS

 B. Intra-corporate Conspiracy Exception 879

 C. Class-based Animus Requirement 880

 1. Legislative History 880

 2. Sixth Circuit Case Law 881

 3. McDonald's Allegations 883

 V. The 42 U.S.C. § 1985(2) Claim 885

 VI. The 42 U.S.C. § 1986 Claim 886

 VII. The Pendent State Claims 887

 A. Intentional Infliction of Emotional Distress (MCO) 887

 B. Breach of Duty Under Employment Contract (MCO) 888

 C. Negligence (State Defendants) 888

 VIII. Res Judicata 888

 IX. The Eleventh Amendment 889

 X. Miscellaneous 889

 A. More Definite Statement 889

 B. Qualified Immunity 889

 XI. Order 889

## OPINION AND ORDER ON MOTIONS TO DISMISS

COHN, District Judge.

## I. THE PROCEDURAL BACKGROUND

### A. Consolidation of Cases

On May 22, 1981 and again on May 25, 1981 the State Prison of Southern Michigan (SPSM) was the subject of prisoner rioting.[1] Beginning in June 1981, individual prisoners started filing *pro per* complaints against the Michigan Corrections Organization (MCO), the labor union for the prison guards, and its president, Gerald Fryt, alleging that MCO instigated the riots by taking over SPSM on the morning of May 22 with the intent of confining its prisoners to their cells indefinitely (a "lockdown") and otherwise violating their constitutional rights. Some of these cases were filed initially in federal court; others were filed in state court and removed by MCO. In some, but not all of the cases the warden of SPSM, Barry Mintzes, and the director of the Michigan Department of Corrections, Perry Johnson, were also named as defendants.

In accordance with a resolution adopted by the judges of the Eastern District of Michigan on February 8, 1982, these various *pro per* actions were consolidated for pretrial purposes. *See Manual For Complex Litigation* § 5.00 at 160–62 (5th Ed.1982). Counsel were appointed for all the plaintiffs who desired representation and in June 1982 amended complaints containing essentially identical allegations were filed in all but two cases. MCO, Fryt, Mintzes, and Johnson were named as defendants in addition to a number of individual prison guards, most of whom have not been served to date. The two complaints which were not amended were removed from the consolidation and one new case, filed *pro per* but closely following the standard amended complaint, was added leaving a total of twenty-two cases. *See* Pre-Trial Order No. 4, filed March 11, 1983. Lead counsel were appointed for plaintiffs to file consolidated motions and briefs on behalf of all plaintiffs addressing issues common to all the cases. Pre-Trial Order No. 3, filed January 26, 1983; *see Manual for Complex Litigation* § 1.92.

### B. The Motions to Dismiss

Now before the Court are motions to dismiss the amended complaints, Fed.R.

---

1. There were also riots in other Michigan prisons during this period; however, the plaintiffs in these cases were all inmates at SPSM.

Civ.P. 12(b)(6), filed by MCO and Fryt (collectively "MCO") and by Mintzes and Johnson (collectively "state defendants"). The motions attack the sufficiency of every claim raised on a variety of grounds.

For the purposes of these motions, a single complaint, *McDonald v. Michigan Corrections Organization,* Civil No. 81–40192, will be taken as the paradigm of all of the complaints. Therefore, to the extent that the other twenty-one complaints have identical allegations to *McDonald,* their claims will state or fail to state a claim to the same extent as *McDonald.*

McDonald makes nine claims (unless otherwise indicated, the claim is made as to all defendants):

1. The actions and omissions of defendants, and the totality of conditions at SPSM, subjected him to cruel and unusual punishment, in violation of the Eighth Amendment and 42 U.S.C. § 1983.

2. Defendants' actions infringed upon his First Amendment rights of speech, religion and privacy, his Fourth Amendment right to be free from unreasonable search and seizure, his Sixth Amendment right of access to counsel and the courts, and his Fourteenth Amendment rights to procedural and substantive due process in violation of 42 U.S.C. § 1983.

3. Defendants' actions constituted a conspiracy to interfere with his access to the courts in violation of 42 U.S.C. § 1985(2).

4. Defendants' actions constituted a conspiracy to deprive him of civil rights as a member of a class of inmates at SPSM in violation of 42 U.S.C. § 1985(3).

5. MCO conspired with persons acting under color of state law to deny him his civil rights in violation of 42 U.S.C. § 1983.

6. Defendants' actions prior to and on May 22, 1981 showed a gross neglect and refusal to take action to protect him from deprivation of his civil rights in violation of 42 U.S.C. § 1986.

7. MCO, Fryt and the individual guard defendants acted with a purposeful and wanton disregard for his health and safety, thus intentionally inflicting emotional distress.

8. MCO, Fryt and the individual guard defendants breached their contract of employment with the state, of which he was a third party beneficiary.

9. Mintzes and Johnson were negligent in failing to protect his health, safety and right to exercise fundamental constitutional rights.

Appended to McDonald's complaint are sixteen exhibits which are incorporated by reference. These exhibits consist of state documents largely describing the events of May 22, 1981 and thereafter at SPSM; most are authored by prison officials including Mintzes. The detailed information in these exhibits is treated as part of the factual allegations of the complaint, Fed.R. Civ.P. 10(c). Therefore, the complaint presents a rich factual predicate upon which to test the legal sufficiency of the claims.

## II. THE FACTS AS ALLEGED

Summarizing the *McDonald* complaint and exhibits, the following are the essential factual allegations.

During the month of May 1981, and particularly during the MCO spring conference on May 16, MCO members discussed and planned to take some kind of illegal action at SPSM. On May 21 Fryt and MCO Vice-President, defendant Michael Huey (Huey) presented Mintzes with a copy of a resolution passed at the May 16 conference. (The contents of the resolution are not alleged in this complaint nor disclosed in the exhibits). Fryt communicated to Mintzes that an unauthorized and illegal job action would take place. A memo from Mintzes to Johnson dated June 1, 1981 indicates that Mintzes was not told what kind of action would be taken or when it would occur. Prior to May 22 Mintzes and Johnson "were further made aware of the activities of the MCO and its officers" by Robert Brown, the Dep-

uty Director of the Department of Corrections. What specific information was conveyed by Brown is not described.

Friday, May 22, preceded the Memorial Day weekend. Shortly after arriving at SPSM around 8:00 a.m., Deputy Warden Scott was informed that Fryt, Huey and defendant David Bokanowski (Bokanowski), another MCO officer, had asked to see him. Scott proceeded to the Warden's Office, where they were waiting; they asked him whether he would "lock down" the institution. Fryt indicated he was concerned that a recent "shakedown" of prisoners had been inadequate and complained that the custodial staff was too small to run the prison properly, a recurring MCO complaint. All three MCO officers stated they were tired of unproductive meetings and that they were going to proceed to lock down the prison at 10:00 a.m. that morning.

Scott called Mintzes at home around 8:30 a.m. and advised him of MCO's threat. Between 8:30 a.m. and 10:00 a.m. Fryt, Huey and Bokanowski used telephones in the warden's office, apparently without opposition from Scott and the other administrators present, to call in off-duty MCO members in preparation for the lockdown. Beginning at 10:00 a.m. MCO members on guard throughout the SPSM Central Complex refused to obey their superiors' orders to release prisoners from their cells at the scheduled times and told their superiors they were only taking orders from Fryt. MCO members at the entrance gate also refused to obey orders and barred visitors from entering SPSM. Between 10:00 and 10:30 a.m. Mintzes arrived at SPSM. After being briefed by Scott, he met with Fryt who admitted that MCO had taken over administrative control of the institution. Fryt was warned of the risk of a prisoner riot as the word spread of the lockdown; Fryt indicated it was a risk MCO was willing to assume. Shortly after noon prisoners

in cell block three acquired cell keys and began unlocking cells. McDonald says that defendant Arnold "took his block and cell keys and threw them on a desk, making them clearly available to prisoners"; however, it is not clear if Arnold's act is alleged to have precipitated the events in cell block three or if Arnold was acting alone or in concert with other MCO members.

As soon as word of the prisoner take-over in cell block three reached the warden's office, Fryt and the other MCO officers permitted Mintzes and Scott to resume control of the institution. Although emergency mobilization measures were taken, numerous fires broke out amid widespread rioting. McDonald says he suffered serious injuries as he assisted prison authorities in putting out fires and rescuing fellow inmates. Other plaintiffs describe similar injuries.

By May 23 prison authorities had SPSM back under control. McDonald says that he was instrumental, as a liaison between the administration and the inmates, in persuading prisoners to return to their cells. During the next several days McDonald met on many occasions with administrators and inmates to negotiate an agreement to prevent further disturbances. McDonald urged a meeting between prisoners and Johnson, predicting that further disturbances would likely occur without such a meeting. McDonald says that MCO members made a concerted attempt to disrupt these negotiations and successfully prevented the proposed meeting with Johnson; however, no specific details as to how MCO disrupted the negotiating process are described.

On May 26[2] rioting again broke out at SPSM, at both the central and northside complex, marked by wholesale burning and looting, and continued through May 27. McDonald does not say that MCO members had any specific role in instigating this

---

**2.** McDonald's complaint as well as the exhibits to it indicate that the second riot began at SPSM on May 26, 1981; however, Judge Stewart Newblatt in *Walker v. Johnson*, 544 F.Supp. 345, 348 (E.D.Mich.1982), found the second riot began at SPSM on May 25. The difference in

dates is not relevant to these motions. *Walker* is an action for injunctive relief challenging the conditions of the confinement at several Michigan prisons following the riots, see Parts III(b) and VIII, *infra*.

second riot, apart from their interference with the negotiating process. On May 26 defendant Jeffrey Schoendorf (a sergeant at SPSM and thus apparently not an MCO member) (Schoendorf) filed a misconduct report accusing McDonald of "inciting to riot", apparently based on McDonald's prediction that further disturbances would occur if there was no meeting with Johnson. Following an administrative hearing on June 19, 1981, McDonald was found not guilty of the charge.

Order was again restored on May 27 and strict controls were imposed by Mintzes and Johnson, which are described as a "lockdown" by plaintiffs. As a result of these officially imposed controls, McDonald claims he was denied access to the law library, adequate yard exercise, sanitary food, access to shower and personal hygiene facilities, religious services and rehabilitation programs. These claims are common to all the plaintiffs. McDonald also raises individual claims relating to loss of specific personal property and destruction of personal papers by Schoendorf and unnamed MCO members to punish him for his active role as a prisoner spokesperson.

## III. THE 42 U.S.C. § 1983 CLAIMS

### A. MCO Motion: State Action

■ MCO and Fryt, in his capacity as union president, move to dismiss all of McDonald's claims against them under 42 U.S.C. § 1983 for failure to allege the requisite state action as to them. State action is a necessary element because all of the substantive violations alleged under § 1983 arise under the Fourteenth Amendment (and under the First, Fourth and Sixth Amendments as applied to the states

through the Fourteenth Amendment). A finding of state action will also satisfy the less-stringent statutory requirement of § 1983 that defendants acted "under color of state law". *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929, 102 S.Ct. 2744, 2750, 73 L.Ed.2d 482, 494 (1982).

MCO contends that McDonald has failed to allege the requisite state action as to it and Fryt, in his capacity as union president, because the union is solely a private party, not a state actor. McDonald responds that MCO conspired with state actors and that a private party who has conspired with state actors may be liable under § 1983, relying on *Adickes v. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). MCO replies that *Adickes* and *Dennis* have been severely limited, if not overruled *sub silentio* by *Lugar, supra,* which created, it says, a new two-part test under which state action will be found as to a private party only when a private party has "jointly participated" with a state actor *and* the actions of the state actor are pursuant to official state policy or law. Because the state actors with which it allegedly conspired were the rebellious guards, who clearly were acting *contrary* to official state policy, MCO reasons that there was no state action under *Lugar.*[3]

MCO's interpretation of *Lugar* is not without support. A recent law review note suggests that *Lugar* may have substantially modified the doctrine set out in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that action taken by state officials made possible by the authority given by the state *is* state action, even if that action is contrary to state law or policy.

**3.** McDonald suggests in his brief in opposition to MCO's motion that MCO also conspired with Mintzes and Johnson in planning and implementing the lockdown. Although this theory is made possible by McDonald's persistent ambiguity in alleging acts as to "defendants" generally, *see* Part X(A), *infra,* it is entirely inconsistent with the exhibits to his complaint, which are treated as part of his allegations. Thus this theory deserves no attention. McDonald also argues that MCO is a state actor and not a

private party because it is a state-recognized public employees union. Although it is not necessary to reach this contention, it is unlikely that the mere status of a union as a recognized public employees union makes its actions state action. *See Power v. Barry County,* No. G–80–97 (W.D.Mich. January 5, 1983). More restraint on plaintiffs' part in pleading a multiplicity of claims and legal theories would substantially accelerate resolution of these cases.

"*Lugar* may require plaintiffs to show in all cases the existence of a relevant state policy and the involvement of state actors. *Lugar* would then be inconsistent with the 'abuse of authority' doctrine set out in *Monroe v. Pape* . . . .

Alternatively, the two-step *Lugar* analysis may apply only where the defendant is a private party. If the defendant were himself a state actor, it would be unnecessary to examine whether he was acting pursuant to a state policy; *Monroe v. Pape* would govern, and the result would be a finding of state action. If the defendant were not a state actor .. [and] the court determined that the private party defendant was indeed a joint participant [with a state actor], the court would then determine whether the state official was acting pursuant to a state policy. Only if the court determined that there was a relevant state policy in play—as in *Lugar*—would it find state action.

The latter interpretation of *Lugar* preserves the holding of *Monroe* but still narrows the scope of section 1983. After *Lugar,* a plaintiff cannot bring a section 1983 suit against a private party who instigates official misbehavior, though under *Monroe* the right to sue the misbehaving official remains."

*The Supreme Court, 1981 Term,* 96 Harv.L. Rev. 62, 244–46 (1982).

This interpretation misreads *Lugar* and ignores the explicitly limited nature of the *Lugar* decision:

"The holding today, as the above analysis makes clear, is limited to the particular context of prejudgment attachment."

457 U.S. at 939 n. 21, 102 S.Ct. at 2755 n. 21, 73 L.Ed.2d at 492 n. 21. *Lugar* was a § 1983 action challenging a private party's use of a state prejudgment attachment procedure which provided for issuance by the clerk of the court of a writ of attachment upon the filing of an *ex parte* petition. No state official was named as a defendant and the only state actors involved were the clerk who issued the writ and the county sheriff who executed it. The complaint

was based on alternative theories: (a) that the defendants improperly invoked the attachment procedure as a matter of state law, or (b) that the attachment statute itself was constitutionally defective.

The Supreme Court held that the first theory did not state a § 1983 claim because there was no state action; the conduct by defendants of which plaintiff complained "could not be ascribed to any governmental decision", rather defendants had acted "contrary to the relevant policy articulated by the state". *Id.* at 940, 102 S.Ct. at 2756, 73 L.Ed.2d at 497. The merely ministerial roles played by the clerk and sheriff did not convert defendants' improper use of the attachment procedure into state action. However, the Supreme Court found that the second theory did state a good claim because it challenged the state's enactment of an allegedly unconstitutional procedure for attaching property prior to judgment, which was executed by state officials pursuant to that statutory scheme. *Id.* at 941, 102 S.Ct. at 2756, 73 L.Ed.2d at 498.

The *Lugar* "two-part test" was not intended as a sweeping rule to alter the well-developed existing law on state action which has "articulated a number of different factors or tests in different contexts" and which involves a "necessarily factbound inquiry". *Id.* at 939, 102 S.Ct. at 2755–56, 73 L.Ed.2d at 496–97. Rather the two-part test was developed to chart a course between prior cases involving the specific issue of state action in prejudgment attachment procedures, holding on the one hand state action to be present where state officials aided the creditor in securing the disputed property, e.g. *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), and finding on the other hand no state action where no state officials participated in executing the levy, *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). The Supreme Court found it necessary to add the first factor, the challenge to the state statute itself, because the merely ministerial acts by the clerk and sheriff, although sufficient to distinguish *Flagg Brothers,* were not enough standing alone to comprise state action. Without this additional require-

ment, every state court plaintiff who invoked the action of state officials to enforce an order or judgment could be a potential § 1983 defendant on the mere claim that the order or judgment was improperly issued as a matter of state law. However, the Supreme Court was careful to note that this two-part analysis is unnecessary where state action is based on the active intentional involvement of a state official in the allegedly unconstitutional act:

> "these two principles ... collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the state to his decisions. *See Monroe v. Pape.*"

*Id.* 457 U.S. at 937, 102 S.Ct. at 2754, 73 L.Ed.2d at 495. In contrast, the *Lugar* defendants did not "have the authority of state officials to put the weight of the state behind their private decision, i.e. this case does not fall within the abuse of authority doctrine recognized in *Monroe v. Pape*". *Id.* at 940, 102 S.Ct. at 2756, 73 L.Ed.2d at 497.

*Lugar* does not undermine the holding of *Adickes,* which is much more analogous to the case at bar. One of the claims in *Adickes* was that defendant's employee, a restaurant manager, conspired with a local policeman to arrest plaintiff for vagrancy because she had attempted to integrate a segregated lunch counter.[4] The policeman's involvement created state action and rendered the private party liable under § 1983 "whether or not the actions of the police were officially authorized or lawful". 398 U.S. at 152, 90 S.Ct. at 1605. The Supreme Court in *Lugar,* citing *Adickes* with approval, noted that whether or not the policeman acted consistently with the vagrancy statute, or with any other official state policy, was irrelevant; "joint action of the private party and the police officer was sufficient". 457 U.S. at 932 n. 15, 102 S.Ct. at 2751 n. 15, 73 L.Ed.2d at 492 n. 15. Thus a private party who violates another's civil rights through the knowing assistance of one clothed with state authority is liable under the Fourteenth Amendment. *See Dennis, supra* (private litigants liable under § 1983 for allegedly corrupting a state court judge to rule in their favor, although clearly judicial actions taken for corrupt purposes are contrary to state law and policy).

Here MCO is alleged to have conspired with state officials—prison guards—to restrict plaintiff's liberty and punish him for exercising his constitutional rights. Although the acts of the guards in furtherance of the conspiracy were contrary to state law, those acts were possible only due to the power conferred on the guards by the state. Indeed it is difficult to imagine persons more subject to the powers of the state than prisoners. At the instigation of MCO, the guards usurped this power to themselves to accomplish their private ends. Thus, in the words of *Lugar,* MCO and its officers *did* "have the authority of state officials to put the weight of the state behind their private decision". 457 U.S. at 940, 102 S.Ct. at 2756, 73 L.Ed.2d at 497. MCO therefore is equally liable.[5]

### B. State Motion

McDonald's § 1983 claims against the state defendants appear to fall into two

---

4. A distinct second claim in *Adickes* was that the private party's actions were pursuant to an official local custom of segregation which standing alone created state action. Justice White, writing for the majority in *Lugar,* was careful to separate this claim, which did require a showing that the challenged action was taken pursuant to official policy or custom, from the conspiracy claim which did not require such a showing. 457 U.S. at 932, n. 15, 102 S.Ct. at 2751 n. 15, 73 L.Ed.2d at 492 n. 15.

5. MCO also argues that the guards were not state actors because they were acting as adversaries to the state, citing *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509

(1981). *Polk County,* which held that a public defender does not act "under color of state law" is easily distinguished. In *Polk County,* the public defender, although a state employee, did not act under any state authority but merely as a private attorney. *Polk County* did not diminish the *Monroe* abuse of authority doctrine. *Lugar* treats *Polk County* as a narrow exception to the rule that "state employment is generally sufficient to render the defendant a state actor". 457 U.S. at 935 n. 18, 102 S.Ct. at 2753 n. 18, 73 L.Ed.2d at 494 n. 18. MCO's defenses suffer from the same lack of restraint as plaintiffs' claims; *see* note 3, *supra.*

categories. The first category relates to MCO's actions on May 22 and the resulting riots; McDonald would hold the state defendants liable under § 1983 for gross negligence in permitting the MCO takeover and the riots. See First Amended Complaint ¶¶ 1, 22, 25, 36, 37 and 49. The second category relates to alleged constitutional deprivations directly imposed by the state defendants following the second riot from May 26, 1981 forward such as denial of access to the law library, adequate yard exercise, sanitary food, adequate shower and personal hygiene facilities, religious services, and rehabilitative programs. First Amended Complaint, ¶¶ 52–55. These deprivations were caused by the increased security measures following the riots and a significant curtailment of the time prisoners were permitted to be out of their cells, a condition referred to by the parties as a "lockdown", though different from the situation created by the MCO takeover since officially imposed by the prison authorities for administrative reasons and of longer duration.

### 1. Personal Involvement

■ The state defendants have moved to dismiss for failure to allege their personal involvement in the alleged constitutional deprivations. See Hays v. Jefferson County, 668 F.2d 869 (6th Cir.1982). As for the alleged failure to prevent MCO's actions, McDonald has specifically alleged that both Mintzes and Johnson were aware of MCO's planned action but failed to take adequate precautions.[6] First Amended Complaint ¶¶ 21, 22, 25 and 49. McDonald has also alleged that the state defendants had a constitutional duty to prevent MCO and its members from taking the actions they did on May 22. These allegations state suffi-

cient personal involvement as to the first category. As for the second category, there can be no doubt that by nature of their positions both Mintzes and Johnson were personally involved in the decisions to impose the various post-riot conditions of confinement at SPSM of which McDonald complains. Accordingly, this argument for dismissal is without merit.

### 2. Constitutionality of Post-Riot Conditions

■ The state defendants also argue, as to the post-riot conditions, that as a matter of law these conditions were constitutional because they were imposed in good faith to restore and maintain order after a state of emergency. This argument is likewise without merit. First, as evidenced by the state defendants' extensive factual recitation in support of this argument, any determination of whether the imposition of the post-riot conditions was constitutionally justified would require an inquiry far beyond the scope of a 12(b)(6) motion. Second, this very issue has already been decided by Judge Stewart Newblatt in Walker, supra (see note 2) (appeal pending). Judge Newblatt concluded, following a seven week trial, that some of the post-riot conditions passed constitutional muster while others did not. As parties to Walker, the state defendants are clearly barred from arguing now that none of the conditions imposed violated constitutional rights. Thus their motion must be denied, although they may be able to raise a collateral estoppel defense as to the conditions found constitutional in Walker. See Part VIII, infra.

### IV. THE 42 U.S.C. § 1985(3) CLAIM

#### A. Elements of a § 1985(3) Claim

■ McDonald alleges that the actions of defendants on May 22, 1981 and thereafter

---

It is also possible that, apart from the allegation that MCO conspired with state actors, MCO might be held liable under § 1983 for the acts of its members which it had specifically ratified. See Shimman v. Frank, 625 F.2d 80, 94–97 (6th Cir.1980) (finding local union liable for assault and battery authorized by business agent and district representative).

**6.** These conclusory allegations however are inconsistent with Exhibit 2 (a memo from Mintzes to Johnson) which indicates Mintzes did not know in advance what kind of action MCO would take or when they would act. This inconsistency, although troubling since Exhibit 2 is incorporated into the complaint, is better addressed by way of a motion for summary judgment.

were "invidious acts to punish plaintiff individually, and as a member of a class of inmates at the SPSM, and to interfere with his access to counsel, legal material, legal process and the courts, which constitutes a conspiracy to interfere with plaintiff's civil rights" in violation of 42 U.S.C. § 1985(3). Although this count refers to all "defendants" generally, the complaint contains no factual allegations to support a § 1985(3) claim against the state defendants. Accordingly, it will be assumed for the purposes of these motions that the § 1985(3) claim relates only to MCO and its alleged co-conspirators. *See* Part X(A), *infra.*

42 U.S.C. § 1985(3) reads, in pertinent parts:[7]

> "If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

In *Griffin v. Breckenridge,* 403 U.S. 88, 102–3, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971), the Supreme Court defined four requisite elements to a claim under this section of § 1985(3): (1) a conspiracy of two or more persons, (2) a racial or other class-based, invidiously discriminatory animus be-

hind the conspirators' actions, (3) an act in furtherance of the conspiracy, and (4) consequential injury to person or property or deprivation of a right or privilege of a citizen of the United States. Unlike § 1983, state action is not required for a § 1985(3) claim. *Id.* MCO contends that McDonald fails to properly allege the first two elements as to it.

## B. Intra-corporate Conspiracy Exception

■ MCO argues that allegations that it conspired with its own officers and members cannot state a § 1985(3) claim because of the intracorporate conspiracy rule, i.e. that a corporation cannot conspire with its own agents because legally a corporation and its agents are but a single person. It is apparently the law in this circuit that the intracorporate rule applies to § 1985(3) actions. *Fallis v. Dunbar,* 386 F.Supp. 1117, 1121 (N.D.Ohio 1974), *aff'd per curiam,* 532 F.2d 1061 (6th Cir.1975); *Schroeder v. Dayton-Hudson Corp.,* 448 F.Supp. 910, 915 (E.D.Mich.1977); *but see An-Ti Chai v. Michigan Technological University,* 493 F.Supp. 1137, 1164–67 (W.D.Mich.1980) (limiting *Fallis* to its facts).[8] Application of the intra-corporate rule to § 1985(3) has been criticized, see Note, *Intra-corporate Conspiracies Under 42 U.S.C. § 1985(c),* 92 Harv.L.Rev. 470 (1978), and was specifically rejected by the Third Circuit, sitting *en banc,* in *Novotny v. Great American Federal Savings & Loan Assoc.,* 584 F.2d 1235, 1256–59 (3rd Cir.1978), *rev'd on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). In reviewing *Novotny,* the Supreme Court expressly assumed without deciding that the directors of a single corporation *could* legally conspire within the meaning of § 1985(3). 442 U.S: at 372 n. 11, 99 S.Ct. at 2349 n. 11.

---

**7.** Section 1985(3) was originally enacted as part of a larger and very long paragraph; § 1985(3) itself, as codified, contains several different provisions separated by semi-colons, of which the pertinent provision is the first. *See* note 17, *infra.*

**8.** In *Taylor v. Brighton Corp.,* 616 F.2d 256 (6th Cir.1980), the Court of Appeals addressed the merits of a § 1985(3) claim that the defendant

corporation had conspired against its employees without discussing whether the intracorporate exception was applicable. Although the opinion refers to defendants in the plural without identifying any other defendant than the corporation, there is no indication that the other defendants were not simply corporate officers and agents.

However, even assuming that the intracorporate rule applies under § 1985(3), MCO has failed to cite any authority that the rule should be extended to an *unincorporated* union. Although unions may function in the collective bargaining context with some of the attributes of a corporation, as voluntary unincorporated associations they do not have a separate legal existence as do corporations. *See Labor and Labor Relations,* 48 Am.Jur.2d § 48 at 109. Indeed conspiracy doctrine has historically been applied to concerted action by union members. *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921). The only authority cited by MCO for its assertion that its members and it are a "single person" are Fed.R. Civ.P. 17(b) and *Lamphere Schools v. Lamphere Federation of Teachers,* 400 Mich. 104, 252 N.W.2d 818 (1977). Rule 17(b) merely states that an unincorporated association may sue or be sued in its own name in federal court where a substantive federal right is asserted by or against it; the rule does not specifically refer to labor unions nor does it confer corporate status. The Court can find nothing in *Lamphere Schools* pertinent to this issue.

MCO's assertion of the intracorporate exception is without merit.

## C. Class-Based Animus Requirement

Whether McDonald's allegations meet the intent or animus requirement of § 1985(3), however, presents a more difficult question.

### 1. Legislative History

Section 1985(3) was enacted as part of Section 2 of the Civil Rights Act of 1871, 17 Stat. 13; the Act was officially entitled "An Act to enforce the provisions of the Fourteenth Amendment to the Constitution of the United States, and for other purposes." Passage was primarily prompted by the activities of the Ku Klux Klan and other secret societies in the South which were opposing Reconstruction, frequently through violence and threats of violence. Comment, *A Construction of Section 1985(c) in Light of Its Original Purpose,* 46 U.Chi.L. Rev. 402 (1979) (hereinafter cited as "A Construction of Section 1985(c)").[9] As originally introduced, Section 2 was solely a criminal provision outlawing certain conspiratorial acts done with the intent "to do any act in violation of the rights, privileges, or immunities of another person". *Griffin,* 403 U.S. at 99–100, 91 S.Ct. at 1796–1797, *citing* Cong.Globe, 42nd Cong., 1st Sess., App. 68 (1871). In response to criticism that this sweeping language exceeded constitutional limits by making any conspiracy to commit, for example, assault and battery a federal crime, Representative Cook suggested a limiting amendment substituting the language now found in § 1985(3) requiring a purpose to deprive a person or class of persons "of equal protection of the laws or of equal privileges and immunities under the laws". *Griffin,* 403 U.S. at 100–102, 91 S.Ct. at 1797–1798; *A Construction of Section 1985(c)* at 411–20. The amendment also added the civil right of action to the criminal sanctions of the original version.[10]

The intended effect of the amendment was to tie the statutory provision more closely to the express language of the Fourteenth Amendment, as explained by Representative Willard, who drafted the amendment together with Cook:

"the essence of the crime should consist in the intent to deprive a person of the equal protection of the laws and of equal privileges and immunities under the laws; in other words, that the Constitution secured, and was only intended to secure, equality of rights and immunities, and that we could punish by United States laws a denial of that equality."

Cong.Globe, 42nd Cong., 1st Sess., App. 188 (1871), *cited in Griffin,* 403 U.S. at 100, 91

---

**9.** This law review comment is the primary source for the legislative history recited herein. *Griffin, supra* and *Browder v. Tipton,* 630 F.2d 1149 (6th Cir.1980), are also important sources.

**10.** The criminal counterpart to § 1985(3) was struck down as unconstitutional, for essentially the reasons anticipated by Representative Cook, in *United States v. Harris,* 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1882). *See A Construction of Section 1985(c)* at 420–21.

S.Ct. at 1797. A similar explanation was given by Representative Shellabarger:

"The object of the amendment is . . . to confine the authority of this law to the prevention of deprivations which shall attack the equality of rights of American citizens; that any violation of the right, the animus and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies of this section."

*Id.* at App. 478; 403 U.S. at 100, 91 S.Ct. at 1797.

▬ The addition of the specific intent language formulated by Cook and Willard satisfied the constitutionality concerns raised in the 42nd Congress because the Congress had substantial evidence in the exploits of the Ku Klux Klan that private conspiracies could effectively thwart implementation by states of the mandates of the Fourteenth Amendment. *A Construction of Section 1985(c)* at 419–20; Wildman, *42 U.S.C. § 1985(3)—A Private Action to Vindicate Fourteenth Amendment Rights: A Paradox Resolved,* 17 San Diego L.Rev. 317 (1980) (hereinafter, *A Paradox Resolved*). The amendment assured that the statute did not reach too far, beyond the kind of conduct likely to threaten Fourteenth Amendment interests and to merely private disputes by requiring the specific intent to destroy the Fourteenth Amendment guarantee of *equal* protection of the laws and *equal* privileges and immunities under the laws.[11] As explained by Senator Edmunds, who was the manager of the bill in the Senate, the test of the requisite specific intent is whether the conspiracy is motivated by a purely personal animus or whether the animus is directed at a *class* of persons, contrary to the essential Fourteenth Amendment principle that all persons are equal before the law:

"We do not undertake in this bill to interfere with what might be called a private conspiracy growing out of a neighborhood feud of one man or set of men against another to prevent getting an indictment in the State courts against men for burning down his barn; but, if in a case like this, it should appear that this conspiracy was formed against this man because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter . . . then this section could reach it."

Cong.Globe, 42nd Cong., 1st Sess., App. 567 (1871). *See Browder, supra,* note 9 at 1151–52 (indicating that Edmunds' comment is to be given "great weight" as the "most detailed description in the legislative history of the type of class-based discrimination cognizable under § 1985").

Most litigation over the scope of § 1985(3) has focused on whether the class of persons alleged to be the intended victims of the conspiracy is of the kind Congress intended to protect by enacting § 1985(3). The Supreme Court in *Griffin* said only that animus directed against racially-defined classes gave rise to a § 1985(3) claim, while reserving the question whether "other class-based animus" would also state a claim. 403 U.S. at 102, 91 S.Ct. at 1798. By citation to Senator Edmunds' example, though, the Supreme Court in *Griffin* pointed the way to recognition of other potentially protected classes, such as members of a political faction or religious group. *Id.* at 102 n. 9, 91 S.Ct. at 1798 n. 9.

### 2. Sixth Circuit Case Law

The Court of Appeals for the Sixth Circuit has found claims under § 1985(3) properly stated in the following three cases: *Marlowe v. Fisher Body,* 489 F.2d 1057, 1064–65 (6th Cir.1973) (conspiracy to deny equal employment opportunities to plaintiff because he was Jewish); *Cameron v. Brock,* 473 F.2d 608 (6th Cir.1973) (conspiracy to deprive supporters of a political candidate opposing an incumbent sheriff of First Amendment protections); *Glasson v. City*

---

**11.** The "specific intent" required, though, does not mean that the defendants necessarily had particular federally-guaranteed rights in mind; an invidiously discriminatory animus directed at a class of persons is sufficient. *Griffin,* 403 U.S. at 102 n. 10, 91 S.Ct. at 1798 n. 10.

*of Louisville,* 518 F.2d 899, 911–12 (6th Cir. 1975) (conspiracy to deprive anti-Nixon demonstrators of First Amendment protections). Allegations were found insufficient to state a § 1985(3) claim in a number of other cases, *e.g. Taylor, supra,* note 8, *Browder, supra* (malicious prosecution conspiracy directed against non-union employees who crossed picket line during strike). The Court of Appeals harmonized these various cases in *Browder* by explaining that conspiratorial animus is actionable under § 1985(3) only when directed against one of two kinds of classes: (1) "discrete and insular minorities", *United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938), that receive special protection under the Equal Protection Clause because of inherent personal characteristics, or (2) classes formed by individuals who join together for the purpose of asserting fundamental rights. 630 F.2d at 1150. *Marlowe* is an example of the first kind of class; *Cameron* and *Glasson* are examples of the second kind.

*Browder* emphasized that a § 1985(3) claim is not stated merely because deprivation of a fundamental right is alleged; rather the essential allegation must be that conspiratorial action was taken against plaintiff *because* that plaintiff was a member of a class defined by its assertion of fundamental rights.

"In each protected case, the tortfeasor's animus is sparked, and the class formed, by the unique and peculiar fashion in which a class of victims exercises a fundamental right .... [T]he tortfeasors discriminate against their victims precisely because of the distinctive manner in which the latter exercise their fundamental rights."

630 F.2d at 1153–54. This construction of § 1985(3) is consistent with the legislative intent behind the limiting amendment drafted by Representatives Cook and Willard because it assures that the conspiracy is of the kind likely to thwart state implementation of the Fourteenth Amendment, because the very purpose of the conspiracy is to defeat collective assertion of the fundamental rights guaranteed by the Fourteenth Amendment. *Taylor* and *Glasson* did not meet this requirement. In *Taylor* plaintiffs alleged a conspiracy to deprive *all* employees of defendant corporation of the right to complain of safety violations free of retaliation; [12] plaintiffs were former employees who had allegedly complained and suffered the consequences. These plaintiffs failed to state a § 1985(3) claim because the conspiracy they alleged was directed at the entire universe of potential victims, i.e. all of defendants' employees, and not at a particular class of persons.

Unlike *Taylor,* the complaint in *Glasson* did identify a class that was allegedly the object of defendants' animus: a class made up of persons crossing the picket line at that specific place of business. However, the right to cross that picket line was not deemed a fundamental right by the *Browder* court. The fundamental right of which plaintiffs were deprived was the right to be free of arrest absent probable cause; however, the alleged conspiratorial animus was not sparked by assertion of *that* right but rather by assertion of the non-fundamental right to cross the picket line. The court in *Browder* concluded that a conspiracy directed at a class defined solely as strike-breakers smacked too much of the private feud identified by Senator Edmunds as outside the scope of § 1985(3). 630 F.2d at 1154.[13]

**12.** It would also appear that the allegations in *Taylor* fell short of the requirements of *Browder* in that the asserted right which allegedly defined the class, the right of private employees to report safety violations, is probably not a fundamental right protected by the Fourteenth Amendment, albeit statutory protections may be applicable.

**13.** The Court of Appeals for the Fifth Circuit came to essentially the opposite conclusion in

*Scott v. Moore,* 680 F.2d 979 (5th Cir.1982), a sharply divided *en banc* decision in which ten out of twenty-four judges dissented. The Supreme Court has granted certiorari, —— U.S. ——, 103 S.Ct. 442, 74 L.Ed.2d 599 (1982), and has heard oral argument, 51 U.S.L.W. 3789 (April 26, 1983). *Scott* will be the first major Supreme Court decision since *Griffin* to define the class-based animus requirement; further guidance in this area is needed in light of the widely varying approaches taken by the courts.

Such a conspiracy is not *inherently* hostile to Fourteenth Amendment interests; its impact on the fundamental right to be free of false arrest is merely incidental to its purpose.

### 3. McDonald's Allegations

[8] Applying the principles explicated in *Browder,* it appears that McDonald has stated a § 1985(3) claim. McDonald has not alleged that MCO's actions were directed against him simply as a member of the class of prisoners generally [14] but rather "as a member of a class of inmates at the SPSM". Although McDonald does not clearly allege what characteristics define this "class", the First Amended Complaint, read as a whole, suggests that the class is composed of inmates like McDonald who aggressively employed both federal litigation and internal prison grievance procedures to enforce their constitutional rights:

¶ 1—"Defendants' actions, in violation of plaintiff's rights, and in breach of their own contractual obligations, were taken against plaintiff and a class of prisoners at the State Prison of Southern Michigan . . . for the purpose of inflicting punishment. Defendants' actions were taken, in part, as a planned reaction to plaintiff's and other SPSM prisoners' exercise of their federal and state-protected rights to procedural due process of law and redress of grievances through administrative and judicial forums."

¶ 18—"Since being at the SPSM, plaintiff has used both administrative and judicial forums for redress of grievances. In some of these actions, the defendants were parties or otherwise involved."

¶ 29—"In May, 1981, plaintiff was the Chairman of the North Complex Warden's Forum (hereinafter Warden's Forum) at the SPSM. This committee, which was organized by the SPSM Warden, was comprised of SPSM administra-tors and inmates who regularly met to discuss and resolve institutional problems involving the North Complex at the SPSM."

¶ 30—"Prior to May 22, 1981, plaintiff, in his capacity as a Warden's Forum member, was active in assisting inmates in pursuing the resolution of their grievances with the institution and its staff."

¶ 31—"Prior to May 22, 1981 plaintiff was openly active in assisting other inmates in the use of the administrative and judicial grievance process. Plaintiff was also openly involved in administrative and judicial proceedings involving the conditions of confinement at the SPSM."

¶ 48—"That above-described actions on May 22, 1981 were further taken to punish and to restrict plaintiff and other prisoners for exercising their right to access to courts and to redress grievances through administrative, state and federal judicial forums."

The class of prisoners to which McDonald allegedly belongs might be conveniently, if loosely, described as "jailhouse lawyers". The rights asserted by this class, and which therefore define them, clearly are fundamental Fourteenth Amendment rights: access to the courts, due process, freedom from conditions of confinement amounting to cruel and unusual punishment.

At first glance, there may appear to be some inconsistency between the allegation that the MCO conspiracy had as its purpose depriving jailhouse lawyers, as a class, of constitutional rights and the factual allegations which indicate that MCO's actions of May 22 were directed against the prison population generally. If the purpose of the MCO conspiracy was to deprive all SPSM inmates of constitutional rights, then the complaint might contain the same flaw as *Taylor, supra,* i.e. that the "class" is identi-

---

See Note, *The Class-Based Animus Requirement of 42 U.S.C. § 1985(c): A Suggested Approach,* 64 Minn.L.Rev. 365 (1980).

14. Prisoners as a class might well be considered a "discrete and insular minority", i.e. a group which "suffers the sort of prejudice which tends . . . to curtail the operation of those political processes ordinarily to be relied upon to protect minorities in our society". *Browder,* 630 F.2d at 153, citing *Carolene Products,* 304 U.S. at 152 n. 4, 58 S.Ct. at 783 n. 4.

cal with entire universe of potential victims.[15] However, the allegations of the complaint do permit the inference that although the methods of the MCO conspiracy initially impacted *all* inmates, the purpose of the conspiracy remained to deprive the jailhouse lawyer class of constitutional rights by (a) creating an *in terrorem* effect designed to chill exercise of rights by the jailhouse lawyers, and (b) coercing prison authorities to restrict the exercise of rights by jailhouse lawyers. Such tactics were precisely those used by the Ku Klux Klan in the post-Civil War South. *Keating v. Carey,* 706 F.2d 377 (2nd Cir.1983); *A Construction of Section 1985(c)* at 407–411. Indeed, such were the alleged tactics in *Griffin:*

> "[T]he conspiracy was alleged to have been inspired by respondents' erroneous belief that Grady, a Tennessean, was a worker for Negro civil rights. Under these allegations it is open to the petitioners to prove at trial that they had been engaging in interstate travel or intended to do so, that their federal right to travel interstate was one of the rights meant to be discriminatorily impaired by the conspiracy, that the conspirators intended to drive out-of-state civil rights workers from the State, or that they meant to deter the petitioners from associating with such persons. This and other evidence could make it clear that the petitioners had suffered from conduct that Congress may reach."

403 U.S. at 106, 91 S.Ct. at 1800.[16] These tactics, even more than the fact that the victims were black, no doubt led the Court to conclude that "the conduct here alleged lies so close to the core of the coverage intended by Congress that it is hard to conceive of wholly private conduct that

would come within the statute if this does not." *Id.* at 103, 91 S.Ct. at 1799.

In many ways, this case, like *Griffin,* is "close to the core" of the original legislative intent of § 1985(3), indeed more so than any of the cases decided by the Sixth Circuit. The 42nd Congress was confronted with an entrenched southern power structure which resisted implementation of the new civil rights conferred by the Fourteenth Amendment by lawless tactics designed to intimidate the intended beneficiaries from enforcing these rights and to interfere with the ability of state officials to comply with their duties under the Fourteenth Amendment.

> "The Klansmen's object was to seize control of state government, to reverse the process of reconstruction, and to nullify the rights recently conferred upon the freedmen by the thirteenth, fourteenth, and fifteenth amendments. Their primary weapon was political terror, directed especially against those whose votes and efforts sought to bring about just and impartial state administration. In this way they hoped to make it politically impossible for the states to accord equal protection."

*A Construction of Section 1985(c)* at 419–20. McDonald essentially alleges that the entrenched prison power structure of MCO members conspired to resist implementation of civil rights guaranteed prisoners under the Fourteenth Amendment by a lawless takeover of the prison designed to intimidate those prisoners most energetically enforcing these rights and to interfere with prison authorities' performance of their duties under the Fourteenth Amendment. These allegations describe no mere "private feud"; they describe a conspiracy on the

---

**15.** Plaintiffs suggested in oral argument on these motions that the SPSM inmates were not the entire universe of available victims and that indeed MCO selected SPSM out from among the several Michigan prisons for their action because prisoners at SPSM were most active in asserting constitutional rights. This theory, while interesting, is not alleged in the complaint, which only states that the animus was directed against "a class of inmates at SPSM".

**16.** *Griffin* also suggests that victims of a § 1985(3) conspiracy who are not actually members of the class against which the animus is directed may nonetheless recover, a distinction of potential import for some of the plaintiffs who do not allege that they themselves were "jailhouse lawyers" as does McDonald. This question is one of several certified to the Supreme Court in *Scott, supra* note 13.

scale and with the forbidden purpose contemplated by § 1985(3).[17]

## V. THE 42 U.S.C. § 1985(2) CLAIM

McDonald's claim under 42 U.S.C. § 1985(2) reads:

"The actions of defendants prior to May 22, 1981, the illegal action on May 22, 1981, and the continuing activities after said date which were for the purpose of punishing plaintiff and obstructing and hindering his suing the state and federally protected rights to procedural due process and access to the courts and counsel, constitute a conspiracy to interfere with plaintiff's civil rights in violation of 42 U.S.C. § 1985(2)."

42 U.S.C. § 1985(2)[18] prohibits three distinct kinds of private conspiracies:

1. Conspiracies to intimidate a party or witness from attending or testifying in a federal court or to injure such a party or witness for so attending or testifying.

2. Conspiracies to influence a federal grand or petit juror or to injure such a juror on account of his activities as a juror.

3. Conspiracies to obstruct justice in a state court with intent to deny a citizen equal protection of the laws or to injure a citizen because he enforced or attempted to enforce the right of any person, or class of persons, to the equal protection of the laws.

MCO[19] has moved to dismiss this claim solely on the ground that McDonald has failed to allege class-based animus. After

17. It appears that the factual allegations of McDonald's complaint might also support a claim under the second provision of § 1985(3) which reaches conspiracies "for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws". The Supreme Court in *Griffin* specifically did not address this provision, 403 U.S. at 99, 91 S.Ct. at 1797. Thus the class-based animus requirement of *Griffin* may not apply to claims under this provision. Although this provision does include reference to "equal" protection of the laws, it does not contain the language of the earlier provision referring to the purpose to deprive "any person or class of persons" of constitutional rights. Because a claim under this provision alleges direct interference with state enforcement of the Fourteenth Amendment, "the constitutional shoals" of interpreting § 1985(3) as a general federal tort law, that concerned the Court in *Griffin, id.* at 102, 91 S.Ct. at 1798, would not be encountered under this provision, unlike the first provision of § 1985(3) that can reach purely private conspiracies with no direct effect on state officials. Indeed, several commentators believe that the element of interference with state enforcement of the Fourteenth Amendment, and not class-based animus, was the primary factor that the 42nd Congress looked to as constitutional justification for § 1985(3). *A Construction of Section 1985(c), supra; A Paradox Resolved, supra.* Because the constitutionality of this latter provision of § 1985(3) is more certain, claims brought thereunder might be more liberally construed. However, in any event the § 1985(3) claim by its reference to "invidious" acts directed against McDonald "as a member

of a class of inmates" is clearly based on the first provision of § 1985(3) only.

If the Supreme Court, in deciding *Scott, supra*, note 13, substantially clarifies the class-based animus requirement, reconsideration of the § 1985(3) claim and amendment of the complaint may be appropriate.

18. 42 U.S.C. § 1985(2) reads in full:

"If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws."

19. As was the case with McDonald's § 1985(3) claim, the § 1985(2) claim refers generally to "defendants" although there are no specific allegations which would seem to support a claim against the state defendants. *See* Part X(A), *infra.*

the motion was filed and argued the Supreme Court held in *Kush v. Rutledge,* —— U.S. ——, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983), that the *Griffin* class-based animus requirement was not applicable to the first two provisions of § 1985(2), dealing with obstruction of federal court proceedings. The Supreme Court, however, left undisturbed the lower court ruling that class-based animus must be alleged as to the third provision, relating to obstruction of justice in state courts. *Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1355 (9th Cir.1981); *accord McCord v. Bailey,* 636 F.2d 606, 613–17 (D.C.Cir.1980).

■■■ It is not altogether clear which provisions of § 1985(2) McDonald claims under. To the extent that he claims under the third provision, he fails to state a proper claim, since he alleges under this count only animus directed at him personally and not at a class of persons. If he claims under either of the first two provisions, although he need not allege class-based animus, he has failed to allege specifically that he or any other person was intimidated from actually attending or testifying in a federal court or that any juror was influenced or injured. In addition, fatal to his claim under any of the provisions is his failure to allege a *specific* state or federal proceeding related to the alleged conspiracy. To state a claim under § 1985(2), a plaintiff must show a nexus between the conspiracy and a court proceeding. *Bradt v. Smith,* 634 F.2d 796, 801 (5th Cir.1981). McDonald's allegation that he has "used both administrative and judicial forums" and that in some of these actions "the defendants were parties or otherwise involved", First Amended Complaint ¶ 18, fails to state the requisite nexus.

Accordingly, McDonald's § 1985(2) claims are dismissed without prejudice to his filing an amended claim specifically alleging the necessary elements. *See Rutledge,* 660 F.2d at 1355.

## VI. THE 42 U.S.C. § 1986 CLAIM

McDonald alleged claims against all defendants under 42 U.S.C. § 1986, which reads in pertinent part:

"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured, or his legal representative, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented .... But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."

MCO's motion to dismiss the § 1986 claim is premised solely on its argument that McDonald has failed to state the necessary predicate claim under § 1985(3); therefore, denial of MCO's motion on the § 1985(3) claim, Part IV, *supra,* necessarily requires denial of its motion on the § 1986 claim.

■■■ The state defendants, however, raise another argument in support of their motion to dismiss this claim, that the amended complaints naming them and raising the § 1986 claim were not filed until more than one year after the § 1986 claim accrued on May 22, 1981. However, statute of limitations is an affirmative defense, Fed.R.Civ.P. 8(c), and thus not a proper basis for a 12(b)(6) motion. C. Wright & A. Miller, 5 *Federal Practice & Procedure* § 1277 (1969). The Court declines to treat the motion as one for summary judgment, Fed.R.Civ.P. 12(b), because it is not properly supported.

■■■ In particular, two factual determinations at least will be necessary to decide the statute of limitations question as to the state defendants. First, it appears that a number of the initial *pro per* complaints, including McDonald's, were filed within one year of May 22, 1981 and named either Mintzes or Johnson. Thus so long as the conduct, transaction or occurrences set forth in the original complaint would support the § 1986 claim, the amended complaint would relate back in those cases

where the state defendants were already parties. Fed.R.Civ.P. 15(c). Second, even in those cases where the state defendants were added as parties after the one year period had run, the amended complaint might relate back even as to them if the state defendants had notice of the institution of the original complaint and knew or should have known that, but for a mistake concerning the identity of the proper party, they would have been named. *Id.* Again, this determination requires a factual inquiry.

Accordingly, the state defendants' motion on statute of limitations grounds is denied without prejudice to its renewal as a properly supported motion for summary judgment.[20]

## VII. THE PENDENT STATE CLAIMS

McDonald raises three pendent state claims: (1) intentional infliction of emotional distress against the MCO defendants, (2) breach of contract as a "common law tort" against the MCO defendants, and (3) negligence against the state defendants.

### A. Intentional Infliction of Emotional Distress (MCO)

█ MCO does not attack the sufficiency of McDonald's allegations supporting the claim of intentional infliction of emotional distress, which is somewhat surprising given the stringent requirements for pleading this tort. *See Warren v. June's Mobile Home Village & Sales, Inc.,* 66 Mich.App. 386, 239 N.W.2d 380 (1976); *Meyer v. Hubbell,* 117 Mich.App. 699, 706–9, 324 N.W.2d 139 (1982); *Ross v. Burns,* 612 F.2d 271 (6th Cir.1980). Rather MCO energetically argues that a public employees union is completely immune from any tort liability under Michigan law; however, the sole Michigan authority cited for this proposition is *Lamphere Schools v. Lamphere Federation of Teachers,* 400 Mich. 104, 252 N.W.2d 818 (1977). MCO reads *Lamphere* too broadly.

As explained by the Michigan Supreme Court, the issue in *Lamphere* was "limited to whether a federation (union) of public school teachers may be held liable in tort by a public school district for alleged monetary damages incurred as a result of a peaceful strike prohibited by the public employment relations act (PERA), MCLA 423.201 *et seq.;* MSA 17,455(1) *et seq.*" 400 Mich. at 107, 252 N.W.2d 818. The plaintiff school district alleged three theories of tort liability: (1) violation of a common law duty not to strike, (2) tortious interference with the individual contractual relationships between the teachers and the school district, and (3) civil conspiracy to violate PERA. The Michigan Supreme Court examined the language and legislative history of PERA and concluded that the Michigan legislature showed no intent to create a private tort remedy for violations of PERA, to the contrary the administrative remedies of PERA were intended to be the exclusive means of enforcing the act. *Id.* at 110–24, 252 N.W.2d 818. As for the school district common-law tort claims based on a duty not to strike and tortious interference, the Michigan Supreme Court found no Michigan precedent for such claims:

> "The proposed remedies in tort which the school district asserts ... are heretofore unknown to the Michigan common law. Although couching its cause in such familiar tort terms as 'causing a breach of a common law and statutory duty', 'intentional interference with individual contractual relationships' and 'civil conspiracy', the school district attempts to recover monetary damages from teacher federations for conduct not presently actionable, to wit: the withholding of services through peaceful concerted action of public employees."

*Id.* at 124–25, 252 N.W.2d 818.

*Lamphere* is clearly distinguishable from McDonald's claim of intentional infliction of

---

**20.** McDonald has also argued that the limitations period was tolled because he was imprisoned, relying on M.C.L. § 600.5851. It is far from clear, however, that a federal court should "borrow" this state tolling provision where the statute of limitations is expressly contained in the federal statute, thus distinguishing the § 1986 claim from § 1983 claims where federal courts must borrow the most analogous state statute of limitations. This issue should be more thoroughly briefed if the state defendants renew their statute of limitations argument in a properly supported motion for summary judgment.

emotional distress on a number of grounds. *Lamphere* did not hold that PERA preempts a cognizable common law tort claim, such as brought by McDonald; rather the Michigan Supreme Court in *Lamphere* declined to *create* a new tort remedy where none before had been recognized. Nor does McDonald in this claim attempt to infer a cause of action from MCO's alleged violation of PERA; rather, the tort claim is quite independent of any possible violation of PERA. Perhaps most importantly, McDonald's claim is not based on "the peaceful withholding of services by public employees". MCO's characterization of its actions on 22 as a "strike" or "work stoppage" is disingenuous. MCO did not merely urge its members not to show up for work on May 22. Instead, according to the allegations of the First Amended Complaint, MCO and its members took affirmative acts to take over the prison, indeed even calling in off duty guards to assist in what was in effect a mutiny. MCO acted to prevent the release of prisoners from their cells at the appointed times for exercise and meals, barred visitors from entering the prison and acted with conscious knowledge that a prisoner riot was a likely consequence. *Lamphere,* a limited decision by its own terms, can hardly extend to cover these unusual circumstances.

Absent more compelling Michigan authority than *Lamphere,* it would be inappropriate for a federal district court to reach the novel conclusion that PERA immunizes a public employees union and its members from common law tort liability for any action arguably related to the employment setting although PERA itself is silent on this point.

### B. Breach of Duty Under Employment Contract (MCO)

■ As to McDonald's claim that the MCO defendants owed a duty under state statute and their employment contracts to perform "their duties in a reasonable and diligent manner" and willfully failed to exercise these duties, thereby breaching contractual obligations to which McDonald was a beneficiary and committing a common law tort, *Lamphere* does support MCO's motion to dismiss. In this count, unlike the previous, McDonald does attempt to create a tort cause of action out of PERA and the employment contracts between MCO and the state. As in *Lamphere,* McDonald can show no case authority for such a tort claim nor do his allegations support his claim to be a third party beneficiary of the contract between MCO and the state. Furthermore, permitting McDonald to enforce PERA through a private tort action for money damages would impermissibly intrude into the exclusive jurisdiction of the Michigan Employment Relations Commission, as discussed in *Lamphere,* 400 Mich. at 117–24, 252 N.W.2d 818.

Just as the Court will not reach out, in the absence of Michigan authority, to bar a recognized common law tort claim on a novel theory, neither will the Court create a new common law tort giving a state prisoner a claim for money damages for a prison guard's breach of his contract of employment with the state.

### C. Negligence (State Defendants)

■ The state defendants have moved to dismiss McDonald's pendent state negligence claim on the basis of statutory immunity. M.C.L. § 691.1407. The motion is well taken. Prison officials are immune under Michigan law from claims alleging negligent supervision of prison personnel. *Layton v. Quinn,* 120 Mich.App. 708, 721, 328 N.W.2d 95 (1982); *Lockaby v. Wayne County,* 406 Mich. 65, 276 N.W.2d 1 (1979). McDonald has failed to allege any of the narrow exceptions to the immunity statute. *See Layton; Lockaby.*

Accordingly, the negligence claim against the state defendants is dismissed.

## VIII. RES JUDICATA

The state defendants have also moved to dismiss the complaint as barred on *res judicata* grounds by the prior class action in *Walker v. Johnson, supra.* This issue has been separately addressed in relation to a subsequent summary judgment motion brought by MCO and the state defendants on *res judicata* grounds and denied in a

bench opinion on June 6, 1983. As explained in the bench opinion, although *Walker* does not operate as a complete bar to these cases, certain findings made in *Walker* may have collateral estoppel effect (potentially against the state defendants as well as plaintiffs). Accordingly, the motion to dismiss on *res judicata* grounds is denied without prejudice to the right of the state defendants to file a motion for summary judgment on appropriate collateral estoppel issues.

## IX. THE ELEVENTH AMENDMENT

The state defendants have moved to dismiss all claims against them for money damages as barred by the Eleventh Amendment. To the extent that they are sued in their official capacities as state officials, the Eleventh Amendment bars recovery of money damages against them. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). However, plaintiffs may maintain an action for money damages against Mintzes and Johnson in their individual capacities. Accordingly, Mintzes and Johnson, in their official capacities as SPSM Warden and Director of the Michigan Department of Corrections, are dismissed; however, they may be retained as defendants in their individual capacities.

## X. MISCELLANEOUS

### A. More Definite Statement

MCO has argued in its motion that certain paragraphs of McDonald's complaint are too vague or conclusory to support McDonald's allegations; generally, these paragraphs simply refer to "defendants" or "MCO members" without identifying specific persons. The state defendants have also moved to dismiss the complaint on the ground that it lacks sufficient specific factual allegations to support a civil rights claim. *See Place v. Shepherd,* 446 F.2d 1239, 1244 (6th Cir.1971).

As is clear from Part II, *supra,* the First Amended Complaint does not lack factual allegations. Rather, the problem is (a) the indiscriminate reference to "defendants"

rather than identification of specific defendants in ¶¶ 1, 28, 45, 46, 47, 51, 52, 57, 63, 67 and ¶¶ 1, 2 and 3 of the prayer for relief; (b) the use of "others" or "MCO's agents" instead of identifying specific persons in ¶¶ 20, 33, 26, 27, 35, 41, 47, 52 and 65; and (c) the failure to identify specifically which "MCO members" acted in concert with defendant Schoendorf in ¶¶ 43 and 44.

The motions by MCO and the state defendants regarding lack of specificity are, therefore, more properly considered as motions for more definite statement, Fed.R. Civ.P. 12(e). Rather than order amendment of the complaints at this time, however, it would seem more appropriate to defer the issue until completion of the first round of discovery in August 1983, which will include depositions of all the named parties, according to the discovery plans filed by the parties. Accordingly, defendants' motions to dismiss for lack of specific factual allegations are denied without prejudice to defendants' right to bring motions for more definite statement following completion of the first round of discovery.

### B. Qualified Immunity

The state defendants have moved to dismiss on the ground that they acted in good faith and are thus entitled to qualified immunity. Qualified immunity is an affirmative defense and may require factual findings; it is therefore a proper subject for summary judgment, not a 12(b)(6) motion. *Alexander v. Alexander,* 706 F.2d 751 (6th Cir.1983); *Harlow v. Fitzgerald,* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982).

## XI. ORDER

Accordingly, for the reasons stated, IT IS ORDERED:

1. Defendants Mintzes and Johnson, in their official capacities only, are DISMISSED.

2. McDonald's negligence claim against Mintzes and Johnson, First Amended Complaint ¶ 73, is DISMISSED.

3. McDonald's common law tort claim against MCO, Fryt, Huey, Bokanow-

ski, Squires, Arnold, Schoendorf and Schnarrs, First Amended Complaint ¶ 71, for breach of contractual obligation is DISMISSED.

4. McDonald's claim for violation of 42 U.S.C. § 1985(2), First Amended Complaint ¶ 61, is DISMISSED with leave to file an amended claim within thirty days provided that (a) the specific provisions of § 1985(2) supporting the claim are identified, (b) specific factual allegations supporting the claim are made, in particular identifying specific court proceedings affected by the alleged conspiracy, and (c) each individual defendant be identified as to the claim and the basis for the claim as to that defendant is specifically alleged.

5. The motions to dismiss the remaining claims, First Amended Complaint ¶¶ 57, 59, 63, 65, 67 and 69, for failure to state a claim upon which relief may be granted, Fed.R.Civ.P. 12(b)(6), are DENIED without prejudice to the right to bring properly supported motions for summary judgment or for more definite statement as discussed above.

6. Plaintiffs other than McDonald have fifteen days in which to file a response to this Order showing how the allegations of their complaint differ in material ways from the *McDonald* complaint so that this Order should not be equally applicable. Defend-

ants may file responses to any such filings only by leave of the Court.

## ON MOTION FOR SUMMARY JUDGMENT *

"Principles of *res judicata* are not ironclad." *Bogard v. Cook,* 586 F.2d 399 at 408 (5th Cir.1978), citing *I B Moore's Federal Practice* ¶ 0.405[1] (2d ed. 1982).

### I.

 Twenty-two prisoner civil rights cases,[1] arising out of the May 1981 riots at the State Prison of Southern Michigan (SPSM) have been assigned to my docket for pre-trial purposes. The complaint in each case is essentially the same. The prisoners allege that the Michigan Corrections Organization (MCO), the labor union for the prison guards, instigated the riots by taking over SPSM on the morning of May 22 with the intent of confining its prisoners to their cells indefinitely (a "lockdown") and otherwise violating their constitutional rights. The plaintiffs seek declaratory relief and money damages.

Now before me is a motion for summary judgment by defendants Michigan Corrections Organization and Gerald Fryt, its president (referred to collectively as MCO). The only issue is whether these actions are entirely barred by the judgment in *Walker v. Johnson,* 544 F.Supp. 345 (E.D.Mich. 1982), since the plaintiff class in *Walker,* of which these plaintiffs were members, failed to bring claims for damages.[2]

---

\* This opinion was initially delivered from the bench on June 6, 1983 in a slightly different form.

1. As listed in Exhibit A to Pre-Trial Order No. 4, filed March 11, 1983.

2. Defendants Barry Mintzes, the prison warden, and Perry Johnson, Director of the Michigan Department of Corrections (referred to as the state defendants) have also filed a motion for summary judgment. It is supported by a two-sentence brief, incorporating by reference MCO's motion and brief, as well as the state defendants' prior motion to dismiss, filed July 20, 1982.

To the extent that the motion of the state defendants relies on the same arguments advanced by MCO, it is denied. However, the

state defendants in their reply brief to their prior motion to dismiss also raised the distinct issue of whether plaintiffs should be collaterally estopped from litigating the constitutionality of the State-imposed, post-riot conditions judged to be constitutional in *Walker.* Such selective application of collateral estoppel as to certain factual determinations may be appropriate; however, the state defendants would also be equally bound by the judgment in *Walker* that certain conditions were unconstitutional. *Crowder v. Lash,* 687 F.2d 996, 1009–12 (7th Cir.1982). A careful analysis is required to determine which factual issues fully and fairly litigated in *Walker* should be controlling in the cases at bar. Because the state defendants have not properly briefed the issue nor clearly identified which factual determina-

## II.

*Walker* was a class action challenging the constitutionality of a wide variety of conditions of confinement at three Michigan prisons; only state prison authorities were named as defendants in *Walker*.[3] The common link between *Walker* and these cases is that the conditions challenged in *Walker* were imposed by the prison authorities following the May riots for the professed reason of restoring and maintaining order. In a detailed opinion and order entered after a seven-week trial, Judge Stewart Newblatt of this district found a number of the post-riot conditions constitutionally flawed and also found that a number of these conditions passed constitutional muster. The only relief sought in *Walker* was declaratory and injunctive. *Walker* is currently on appeal to the Court of Appeals for the Sixth Circuit.

Paragraph 21 of the amended complaint in *Walker* stated:

"Damage actions for individual injuries suffered in violation of constitutional rights will be brought in individual actions by plaintiffs and members of plaintiff class."

Shortly after the filing of the amended complaint defendants in *Walker* filed a motion to strike Paragraph 21 as "irrelevant and immaterial," because the only relief sought under the amended complaint was declaratory and injunctive. (Apparently an initial complaint filed by the named plaintiff sought money damages). On August 20, 1981, the parties stipulated to strike Paragraph 21.

On October 21, Judge Newblatt entered the following class certification order:

"IT IS HEREBY ORDERED, that this action shall proceed on a class action basis pursuant to Federal Rules of Civil Procedure 23(b)(2). The class shall be defined as all prisoners who are, or will be, confined at Marquette Branch Prison, Michigan Reformatory, and/or State Prison at Southern Michigan, North, Central and South complexes.

This being an action for declaratory and prospective relief, notice to the class is not ordered, subject to further order of the Court."

There is no dispute that plaintiffs in these cases are members of the class certified in *Walker*.

## III.

MCO contends that to permit plaintiffs to now assert individual claims for damages would violate the principle against splitting a single cause of action into separate pieces of litigation. Although MCO cites a multitude of cases, only a single district court decision supports their position.[4] The court

---

tions in *Walker* should be controlling here, their motion for summary judgment as to the collateral estoppel question is denied without prejudice. Renewal of the motion might be more appropriate after discovery is completed when plaintiffs' claims are better delineated and there is a factual record.

3. "Plaintiffs have named four defendants in this action: One defendant is the Michigan Department of Corrections. The other three defendants, sued individually and in their official capacities, are: Perry Johnson, Director of the Michigan Department of Corrections; Barry Mintzes, Warden of Southern Michigan Reformatory at Ionia; Theodore Koehler, Warden of Marquette Prison." 544 F.Supp. at 347, note 3.

4. Two court of appeals cases cited by MCO do not support its argument. In *Goff v. Menke*, 672 F.2d 702 (8th Cir.1982), the court held that an individual prisoner action should be dismissed without prejudice and the prisoner directed to seek his relief through a concurrently pending class action. The court in *Goff* indicated that equitable relief directed at the same prison conditions should be rendered in a single class action if possible, while noting that individual claims for money damages could be handled on an individual basis. *Id.* at 704. The plaintiff in *Smallwood v. Missouri Board of Probation and Parole*, 587 F.2d 369 (8th Cir. 1978), was barred from relitigating the constitutionality of certain parole procedures previously upheld in a class action in which he was a member of the class; however, two issues not raised in the prior class action were considered on their merits. Moreover, the court noted that the plaintiff, appearing *pro se*, had not even challenged the district court's ruling that he was bound by the prior class action. *Id.* at 371. A third decision from the Eighth Circuit cited by MCO, although not directly pertinent, appears to support plaintiffs' position in *dicta*, *Cotton v. Hutto*, 577 F.2d 453, 454, note 4 (8th Cir.1978).

in *International Prisoners' Union v. Rizzo,* 356 F.Supp. 806 (E.D.Pa.1973) held that individual claims for damages based on allegations of unconstitutional prison conditions were barred by the failure of a previous plaintiff class to raise a claim for damages in an action for injunctive relief directed at the same or similar prison conditions. However, in that previous class action notice was sent to the entire class, a factor missing in *Walker.*

In contrast, every federal court of appeals that has considered the question has held that a class action seeking only declaratory and injunctive relief does not bar subsequent individual suits for damages based on the same or similar conditions. *See Crowder v. Lash,* 687 F.2d 996, 1007–9 (7th Cir.1982); *Herron v. Beck,* 693 F.2d 125 (11th Cir.1982); *Bogard v. Cook,* 586 F.2d 399, 406–9 (5th Cir.1978); *Jones-Bey v. Caso,* 535 F.2d 1360 (2nd Cir.1976). The reasoning of *Bogard* for not giving the prior class action, *Gates v. Collier,* 349 F.Supp. 881 (N.D.Miss.1972), aff'd, 501 F.2d 1291 (5th Cir.1974), preclusive effect is equally applicable here:

> "Nor is it by any means certain that the *Gates* class action would have remained manageable if it had been expanded to include claims for damages by individual prisoners. The real defendant in *Gates* was the Parchman Prison itself; all of the District Court's energy and attention were (and still are) necessarily focused on the broad expanse of constitutional violations exposed and the proper dimension of judicial intervention required to correct them. The abuses at the heart of *Gates* ... were broad-based and affected the prisoners as a community.
>
> . . . . .
>
> Claims for individual damage relief, by contrast, would have required separate mini-trials for each prisoner. Because damage relief could only have been sought against officials in their individual capacity, the problem of qualified immunity would have been injected into the suit .... Significantly, the district

court only certified *Gates* as a Rule 23(b)(1) and (2) class action, and not a (b)(3) action, which would have been the proper classification if joinder of all individual damage claims had been sought. Given the lack of common questions of fact as to many of those claims, and the unmanageability of the suit had they been included, we cannot believe that the district court would have allowed the claims as part of that action if they had been recognized as potentially possible."

586 F.2d at 409.

The controlling Sixth Circuit precedent cited by MCO is simply not relevant. The Sixth Circuit, in *Lasky v. UAW,* 638 F.2d 954 (6th Cir.1981), affirmed the finding of the district court that representation of the class in a previous case had been adequate and held that dissident class members were bound by the approved settlement and could not relitigate identical claims in a subsequent action. *Lasky* did not involve the issues presented here, whether the failure to raise damage claims in a prior class action seeking declaratory and injunctive relief bars subsequent individual actions for damages. *Alexander v. Aero Lodge No. 735,* 565 F.2d 1364 (6th Cir.1977), is authority for the proposition that under some circumstances notice need not be given to member of a Fed.R.Civ.P. 23(b)(2) class action prior to entry of judgment; however, in *Alexander* all claims, including those for damages, were raised in the class action and there was no issue raised of barring subsequent individual actions. *Stewart v. Butz,* 491 F.2d 165 (6th Cir.1974), merely held that the defendant Secretary of Agriculture was bound by prior adjudications as to liability in other class actions in the instant class action where identical issues were presented in all three class actions. None of these cases were prisoner civil rights actions. Neither did they address the problems which would face a district court attempting to adjudicate thousands of damage claims in the context of a sweeping class action for prospective injunctive relief aimed at pervasive prison conditions. *Lasky* and *Alexander* merely carve out very

narrow exceptions to the general rule that Fed.R.Civ.P. 23(b)(2) is an inappropriate device for handling claims for money damages, and in both cases the monetary relief was essentially equitable in nature and ancillary to the primary injunctive relief.[5]

MCO's argument is further flawed in its assumption that the plaintiff class in *Walker* could have litigated a damage claim by each individually injured prisoner. Judge Newblatt carefully limited class certification to claims for declaratory and prospective relief only, thus dispensing with the need to give notice to the class. The careful limitation of the scope of the *Walker* litigation so as not to encompass or preclude individual damage actions is consistent with good class action practice:

> "[I]t may be appropriate to reduce the complexity of class litigation by imposing special limits on the basic transactional approach to defining a claim or cause of action. A sophisticated transactional approach, indeed, includes trial convenience in its calculus .... Such limitations on claim preclusion, indeed, are often built into the determination that identifies the scope of the class action .... Pursuant to the same general principle that claim preclusion does not apply to matters that could not be advanced in a prior action, individual actions remain available to pursue any other questions that were expressly excluded from the class action."

18 *Wright & Miller,* Federal Practice & Procedure, ¶ 4455 at 475 (1981).

## IV.

In any event, there are vast differences between both the factual issues and legal theories in the cases at bar compared to those in *Walker* which would make total claim preclusion inappropriate, if not violative of the due process rights of plaintiffs. The major claim in these cases is that MCO conspired with its members to stage what in effect was a mutiny of the State Prison at Southern Michigan on May 22, 1981 by refusing to release prisoners from their cells and otherwise taking over control of the prison. Plaintiffs allege that MCO took these actions to punish them for exercising their constitutional rights, and in particular for their vigilant use of the prison grievance system and of Federal civil rights litigation. Plaintiffs say these actions of MCO were in violation of their rights under 42 U.S.C. §§ 1983, 1985(2) and 1985(3). Damages claimed include deprivation of liberty interests during the fairly short period while MCO controlled the prison as well as a wide variety of injuries suffered during the two subsequent prison riots which plaintiffs claimed were caused by MCO's actions. Plaintiffs seek to hold the state defendants liable for their failure to prevent MCO's actions under 42 U.S.C. § 1986. None of these claims were presented in *Walker.*

The complaint in *Walker* was based entirely on the events from May 26, 1981 forward, following a second riot, when the prison authorities imposed strict controls on the prison population, purportedly to restore order. MCO was not a party to *Walker* nor were its actions on May 22 addressed except as background. *Walker* focused entirely on the constitutionality, under the circumstances, of the State-imposed controls. As to MCO, the judgment in *Walker* is relevant only insofar as plaintiffs here argue that the State-imposed restrictions are an element of the damages caused by MCO's actions on May 22, since they were imposed due to the rioting on May 22 and May 25, rioting which plaintiffs allege was caused by MCO's actions.[6]

Thus, not only were the forms of relief sought in *Walker* different than that sought here; *Walker* was a substantially different case overall, despite some overlap as to events occurring after May 26, 1981.

---

**5.** In *Lasky* the damages sought were reimbursement of back insurance premiums in an action to enjoin termination of insurance benefits; in *Alexander,* back pay in a Title VII action.

**6.** As to the state defendants, the commonality of issues between these cases and *Walker* is much greater to the extent that plaintiffs' claims here are based on the actions of the state defendants' in imposing and maintaining the post-May 26 conditions.

## V.

Accordingly, MCO's motion for summary judgment is DENIED.[7]

SO ORDERED.

7. MCO filed a twenty-five page brief in support of its motion citing forty-five cases; most of these cases are only authority for general *res judicata* principles and are not pertinent to the specific argument raised by the motion. MCO's reply brief of twenty pages, see e.g. pages 7 and 8, suffers from the same deficiency. A focused discussion of the directly pertinent cases such as *Bogard* and *Crowder* would have conserved both my energy and that of the parties, and certainly reduced the legal costs undoubtedly associated with the motion.